## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| FRED DAVIS, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | No. 04 C 3427 |
| SPSS, INC., JACK NOONAN, EDWARD HAMBURG, and KPMG LLP, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Fred Davis, individually and on behalf of all others who purchased SPSS, Inc. (SPSS) common stock between May 2, 2001 and March 30, 2004, brought this action for securities fraud against defendants SPSS; two of its executives, Jack Noonan and Edward Hamburg; and its auditor, KPMG. Plaintiff alleges violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and the Securities and Exchange Commission (SEC) Rule 10b-5, 17 CFR § 240.10b-5. SPSS, Noonan and Hamburg (SPSS defendants) now move to dismiss the complaint in its entirety, as does KPMG. For the following reasons, both SPSS defendants' and KPMG's motions are granted.

## BACKGROUND

SPSS is a publicly traded, Chicago-based, technology company, which specializes in predictive analytics software and services. Since January 1992, Jack Noonan has served as SPSS' president and chief executive officer, as well as a member of its board of directors. Edward Hamburg was SPSS' executive vice-president of corporate operations, chief financial

officer and secretary from July 1992 until August 11, 2004. Plaintiff Fred Davis purchased 115 shares of SPSS common stock at a price of $17.73 per share on April 25, 2002. On May 14, 2004, plaintiff filed a complaint, followed by an amended complaint, arguing that he and others who purchased SPSS stock between May 2, 2001 and March 30, 2004, paid an inflated price for the shares, due to misleading statements knowingly made by defendants.

From May 2001 through February 2004, SPSS issued press releases and filed 8-K, 10-Q and 10-K forms with the SEC that stated its financial results for various time periods. These press releases and SEC filings included the following:

(1) First Quarter 2001 Earnings Release, issued May 2, 2001
(2) First Quarter 2001 10-Q, filed May 15, 2001
(3) Second Quarter 2001 Earnings Release, issued July 31, 2001
(4) Second Quarter 2001 10-Q, filed August 14, 2001
(5) Press Release, issued October 10, 2001
(6) Third Quarter 2001 Earnings Release, issued October 30, 2001
(7) Third Quarter 2001 10-Q, filed Nov. 14, 2001
(8) Press Release, issued February 12, 2002
(9) Fourth Quarter 2001 and Fiscal Year 2001 Earnings Release, issued February 20, 2002
(10) 2001 Annual Report (Form 10-K), filed April 1, 2002
(11) First Quarter 2002 Earnings Release, issued May 2, 2002
(12) First Quarter 2002 10-Q, issued May 15, 2002
(13) Second Quarter 2002 Earnings Release, issued July 30, 2002
(14) Second Quarter 2002 10-Q, filed August 14, 2002
(15) Third Quarter 2002 Earnings Release, issued October 30, 2002
(16) Third Quarter 2002 10-Q, filed November 14, 2002
(17) Fourth Quarter 2002 and Fiscal Year 2002 Earnings Release, issued February 12, 2003
(18) 2002 Annual Report (Form 10-K), filed April 2, 2003
(19) First Quarter 2003 Earnings Release, issued April 30, 2003
(20) Form 8-K (Transcript of Conference Call with Analyst), filed on April 30, 2003
(21) First Quarter 2003 10-Q, filed on May 15, 2003
(22) Second Quarter 2003 Earnings Release, issued July 3, 2003
(23) Second Quarter 2003 10-Q, filed August 13, 2003
(24) Press Release, issued October 15, 2003
(25) Third Quarter 2003 Earnings Release, issued on October 28, 2003
(26) Third Quarter 2003 10-Q, filed November 10, 2003
(27) Fourth Quarter 2003 and Fiscal Year 2003 Earnings Release, issued February 17, 2004

In the press release dated October 15, 2003, SPSS announced a revision to an agreement it had with America Online (AOL). Two years earlier, on October 22, 2001, SPSS entered into a multi-year alliance with AOL from which SPSS gained certain operating assets and the exclusive right to distribute survey data drawn from AOL's millions of users. In return, SPSS agreed to pay AOL $12 million in SPSS common stock and $30 million in cash installments. In 2003, SPSS and AOL agreed to reduce the remaining term of their alliance from two years to one year. As SPSS announced in its October 15, 2003, press release, this revision would result in "adjustments to both the assets and liabilities portions of the SPSS balance sheet." A report filed with the SEC that same day, on Form 8-K, listed the adjustments as a $9.8 million reduction in merger consideration ($3.2 million in current liabilities and $6.6 million in non-current liabilities); a $6 million reduction in additional paid-in capital; a $5.5 million reduction in intangible assets; and a $10.3 million reduction in good will. SPSS noted that this would not effect the company's income statement for the third quarter of 2003, nor did it foresee an effect on the fourth quarter.

On March 15, 2004, SPSS requested a 15-day extension to file its Form 10-K for fiscal year 2003, because it needed to complete the restatement of prior financial results effected by the October 2003 amendments to the AOL agreement. However, on March 30, 2004, the company issued another press release stating that it was further delaying the filing of its 2003 Annual Report on Form 10-K. In addition to adjusting prior financial results to reflect the amended AOL agreement, SPSS announced that it had discovered an error in its deferred revenue accounts related to the implementation, at the end of 2000, of new accounting interpretations of revenue recognition. SPSS stated that the error caused it to overstate revenues by between three and six million dollars. The press release further stated that as a

result of this error SPSS was reviewing and having auditors verify its deferred revenue accounts for the restated financial statements for 2001 and 2002, as well as the unreleased financial statements for 2003. The following day the price of SPSS stock fell 12.17% from $20.95 to $18.40 per share.

SPSS filed its Form 10-K with the SEC for 2003 on July 29, 2004. The report included restated financial results for 2001, 2002, and the first three quarters of 2003. SPSS explained that the restatements were necessary due to amendments in the AOL agreement, errors in deferred revenue accounts from the fourth quarter of 2000 through the third quarter of 2003, income tax expenses, and a change in the recognition of licensing fee revenues from transactions completed by SPSS distribution partners. As a result, for 2001, SPSS' net loss increased from the previously reported $21.232 million to $26.396 million and for 2002 the net loss increased from $7.899 million to $16.760 million. For the first, second and third quarters of 2003, the net incomes went from $1.361 million to a loss of $58,000, from $2.245 million to $513,000, and from $3.351 million to $2.692 million, respectively.

In his complaint, plaintiff alleges the cause of SPSS' restatements was not inadvertent error, but rather "a manipulative and deceptive scheme to artificially inflate the market price of the Company's common stock." He argues that this is supported by allegations of confidential witnesses, defendants' financial motives, and their violation of generally accepted accounting principles (GAAP). Plaintiff's complaint discusses the allegations of five different confidential witnesses (CW-1 through CW-5). CW-1 was a sales director for SPSS' federal government division in Arlington and Chicago from fall 2000 until the end of 2001. In September 2001, she allegedly notified Hamburg and Senior Vice-President Mark Pataglia, in writing, that Arleen Garcia, the head of the SPSS sales department, directed employees to

record revenues from orders before they had shipped, for the purpose of enhancing SPSS' financials. CW-2, a former federal account manager who worked under Garcia in Arlington from February 1999 through May 2004, confirms this practice. Allegedly, Garcia booked sales without purchase orders at the end of every quarter, and then later would record corresponding returns for the false sales. In response to CW-1's notification, Hamburg informed her that she needed to work with Garcia or leave SPSS. Plaintiff, while not alleging the amount involved, contends that the restated financials for the years 2001, 2002 and 2003 still do not fully address this overstated revenue.

Plaintiff alleges that CW-3, a former vice-president of strategic planning, who worked in SPSS' Chicago and Arlington offices, confirms the regular practice of SPSS employees recording deferred revenue so they could become eligible for sales bonuses. Furthermore, CW-3 claims to have first-hand knowledge that Noonan and Hamburg were aware of this practice and condoned it. CW-4, a former sales manager and product manager for one of SPSS' divisions, adds the allegation that salespeople would have clients post-date and pre-date agreements so they could achieve their monthly sales goals.

Plaintiff also alleges that the accounting firm KPMG, which served as SPSS' outside auditor during the relevant time period, played a role in the fraud. He maintains KPMG assisted SPSS in the preparation of its annual and quarterly statements by reviewing the quarterly statements and Form 10-Q reports and auditing the company's annual financial statements and Form 10-K reports. Plaintiff asserts that KPMG diverged from the generally accepted auditing standards (GAAS) when auditing SPSS and ignored a number of "red flags." Instead of conducting a legitimate audit, the auditor allegedly rubber-stamped the company's financial statements and provided false and misleading statements regarding SPSS'

financial results in its audit opinions.

## DISCUSSION

Both the SPSS defendants and KPMG filed motions to dismiss. SPSS defendants contend that count I of plaintiff's amended complaint, for violation of § 10(b) of the Securities Exchange Act, and SEC Rule 10b-5, fails to plead fraud with the particularity required by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4, and fails to state a claim under Federal Rule of Civil Procedure 12(b)(6). Likewise, KPMG argues that this claim does not satisfy the pleading requirements. Noonan and Hamburg, the named defendants in count II, argue that this claim for violation of § 20(a) of the Securities Exchange Act must be dismissed if count I fails, because it is a derivative claim.

A Rule12(b)(6) motion to dismiss tests the sufficiency of the complaint, not the merits of the case. Triad Assocs., Inc. v. Chicago Hous. Auth., 892 F.2d 583, 586 (7th Cir. 1989). In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must assume the truth of all well-pleaded allegations, making all inferences in the plaintiff's favor. Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund, 25 F.3d 417, 420 (7th Cir. 1994). The court should dismiss a claim only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

Rule 9(b) applies heightened pleading standards to claims of fraud, including violations of SEC Rule 10b-5. DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990). To satisfy the rule, a complaint must plead fraud claims with particularity, providing the circumstances of the claim – "the who, what, when, where, and how: the first paragraph of any newspaper story." Id. In addition, private securities fraud claims brought under the Securities Exchange

Act have an additional pleading hurdle to surmount, the requirements of the Private Securities

Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b). The PSLRA requires the complaint to

"specify each statement alleged to have been misleading, the reason or reasons why the

statement is misleading, and, if an allegation regarding the statement or omission is made on

information and belief, the complaint shall state with particularity all facts on which that belief

is formed." 15 U.S.C. § 78u-4(b)(1). The pleading requirement for state of mind is also more

stringent under the PSLRA than under Rule 9(b). While the heightened pleading standard

of Rule 9(b) still allows a party to aver generally a defendant's condition of mind, under the

PSLRA the complaint must "state with particularity facts giving rise to a strong inference that

the defendant acted with the required state of mind" with respect to each misleading statement

or omission alleged. *Id.* § 78u-4(b)(2). We will address SPSS defendants' motion first and

then KPMG's. The crux of SPSS defendants' arguments rest on the contention that plaintiff

has failed to satisfy the stringent requirements of fraud pleading under Rule 9(b) and the

PSLRA, but first they argue that plaintiff has no standing to bring count I as to certain

statements.

**SPSS Defendants' Motion to Dismiss**

**Standing**

To state a claim for violation of §10(b) and Rule 10b-5, promulgated thereunder, a

plaintiff must allege that "1) the defendant made a false statement or omission 2) of material

fact 3) with scienter 4) in connection with the purchase or sale of securities 5) upon which the

plaintiff justifiably relied 6) and that the false statement proximately caused the plaintiff's

damages." Caremark, Inc. V. Coram Healthcare Corp., 113 F.3d 645, 648 (7th Cir. 1997); *see*

Dura Pharmaceuticals, Inc. v. Broudo, 125 S.Ct. 1627, 1631 (2005).[1]  Plaintiff employs the

fraud-on-the-market theory to support his claim.  This theory posits that plaintiff's reliance

(and that of other investors) on defendants' statements may be presumed in a Rule 10b-5

action because an investor buys stock in reliance on the integrity of the market price, which

reflects publicly available information. Basic Inc. v. Levinson, 485 U.S. 224, 247 (1988); Roots

Partnership v. Lands' End, Inc., 965 F.2d 1411, 1416 n.4 (7th Cir. 1992).

SPSS defendants argue that plaintiff does not have standing to bring a Rule 10b-5 claim

based on statements they allegedly made after plaintiff purchased SPSS stock, because he

could not have relied on post-purchase statements when buying the shares that caused his loss,

or, for purposes of the fraud-on-the-market theory, his share price could not have reflected

post-purchase statements.  Plaintiff maintains that as long as he has standing based on some

claim, he can state claims for which he does not have standing on behalf of putative class

members.

The Seventh Circuit has held that a plaintiff does not have standing to bring a Rule

10b-5 claim based on allegedly false statements made by defendants after plaintiff purchased

the defendant company's stock. Roots Partnership, 965 F.2d at 1420.  In Roots Partnership,

the plaintiff brought a securities fraud class action after purchasing stock in Lands' End.  The

court affirmed dismissal of the plaintiff's Rule 10b-5 claim based on statements made by

Lands' End after the plaintiff purchased its stock.  As the court explained, "[s]uch post-

purchase statements cannot form the basis of Rule 10b-5 liability, because the statements could

not have affected the price at which plaintiff actually purchased." Id. at 1420.  Many courts

---

[1] Though not an issue for purposes of this motion to dismiss, in the event plaintiff chooses to file an amended complaint, he should consult the Supreme Court's recent analysis in Dura Pharmaceuticals, Inc. regarding pleading requirements for loss causation.

in this circuit have dismissed securities fraud claims in accord with this principle. *See, e.g.*, DH2, Inc. v. Athanassiades, 359 F.Supp.2d 708, 719 (N.D.Ill. 2005); Greater PA Carpenters Pension Fund v. Whitehall Jewellers, Inc., 2005 WL 61480 at *7 (N.D.Ill. 2005)(dismissing plaintiff's class action claim for § 10(b) liability based on allegedly false statements and omissions made after plaintiff's last purchase because "[t]he Court is bound by the Seventh Circuit's decision in *Roots*"); Ong ex rel. Ong IRA, 2004 WL 2534615 at *23 (N.D.Ill. 2004); Heartland Financial USA, Inc. v. Financial Institutions Capital Appreciation Partners I, L.P., 2002 WL 31819008 at *7 (N.D.Ill. 2002); Anderson v. Abbott Laboratories, 140 F.Supp.2d 894, 908 (N.D.Ill. 2001). Furthermore, the Seventh Circuit found that plaintiff, lacking standing to bring its own claim, could not state a claim on behalf of other investors who purchased Lands' End stock after the statements were made. Roots Partnership, 965 F.2d at 1420 n.6 ("Having no claim of its own based on the post-purchase statements, [the plaintiff] would not be a proper representative of a class of persons who bought Lands' End stock after defendants' allegedly fraudulent ... statements.").

Plaintiff disputes the contention that he cannot bring a claim for post-purchase statements. He argues that the plaintiff's post-purchase claim in Roots Partnership was dismissed because it failed to state a claim for pre-purchase statements. Yet, the Seventh Circuit's discussion of the post-purchase statements belies this assertion. There is no indication that its decision was contingent on the success or failure of any of the plaintiff's other claims. *See id.* at 1420. The plaintiff could not establish Rule 10b-5 liability against the defendant based on post-purchase statements because statements made after its purchase could not have caused its loss. And the plaintiff could not gain standing to pursue this claim by purporting to represent the interests of those who made later stock purchases. *Id.* at 1420

n.6.

Yet, relying on <u>Danis v. USN Communications, Inc.</u>, 189 F.R.D. 391 (N.D.Ill. 1999), plaintiff argues that as long as he has standing to pursue some claim, he can state a claim for the SPSS defendants' post-purchase statements on behalf of shareholders who made subsequent purchases. In <u>Danis</u>, the court was not addressing a motion to dismiss, but rather the lead plaintiffs' motion to certify a class. *Id.* at 394. In their opposition to the certification, the <u>Danis</u> defendants argued that the lead plaintiffs could not represent the class because they lacked standing to assert all of the claims alleged in the complaint, which involved purchases both during an initial public offering and purchases in the aftermarket. *Id.* at 398. The court rejected defendants' argument, noting that since one lead plaintiff purchased stock during the IPO, and the other in the aftermarket, between the two of them they had standing to assert all claims. *Id.* at 398.

Thus, not only is <u>Danis</u> distinguishable from the instant case because it concerns whether the claims of the two lead plaintiffs are typical of a plaintiff class and not whether a claim must be dismissed due to the plaintiff's lack of standing, it also fails to support plaintiff's core contention that a complaint can state a claim for which no named plaintiff has standing. Even though each lead plaintiff in <u>Danis</u> did not have standing to bring every claim, between the two of them they did have standing to pursue all the claims. Therefore, they could represent a plaintiff class composed of both purchasers at the IPO and purchasers in the aftermarket.[2] Plaintiff Fred Davis, on the other hand, does not have standing to bring a claim

---

[2] Furthermore, even if the lead plaintiffs did not have standing to bring all the claims, perhaps another named plaintiff in <u>Danis</u> did have standing. Though the court in <u>Danis</u> did not address the distinction between a lead plaintiff under the PSLRA and named plaintiffs, the terms are not synonymous. Some courts have found that even though a lead plaintiff may not have standing to pursue a claim, the action may proceed as long as a named plaintiff has standing. *See* <u>Greater Pennsylvania Carpenters Pension Fund v. Whitehall Jewellers, Inc.</u>, 2005 WL 61480 at *8 (N.D.Ill. 2005)(*citations omitted*). In this case, the distinction is irrelevant as Fred Davis is both the lead plaintiff and the only named plaintiff.

for post-purchase fraudulent statements, as was made clear by <u>Roots Partnership</u>. Nor is there any other named plaintiff who has standing to pursue this claim. Plaintiff may not save the claim from dismissal by claiming to state it on behalf of other investors. <u>Roots Partnership</u>, 965 F.2d at 1420; <u>Whitehall Jewellers, Inc.</u>, 2005 WL 61480 at *8 (N.D.Ill. 2005). As plaintiff lacks standing to state a Rule 10b-5 claim based on post-purchase statements, we will only consider the allegedly fraudulent statements defendants made prior to April 25, 2002.

### Rule 9(b) and the PSLR

#### False Statements of Material Fact

The bulk of defendants' remaining arguments for dismissal rests on the assertion that plaintiff has failed to adequately plead his claims. Defendants contend that this failure applies to both plaintiff's allegations concerning the relevant conduct – the misstatements or omissions of material fact – and the defendants' *scienter*. The pleadings regarding false statements of material fact are allegedly deficient because they rely on group pleading; they do not sufficiently identify the misleading statements and violations of generally accepted accounting principles (GAAP); and they include forward-looking statements, puffery, and representations concerning the AOL agreement, none of which is actionable. Defendants also argue that the complaint fails to give rise to a strong inference of *scienter*, despite plaintiff's allegations of motive and GAAP violations.

Plaintiff alleges that statements made in press releases, and Form 10-Q's and the Form 10-K filed with the SEC between May 2, 2001 and the date of his stock purchase, were false and misleading for fourteen reasons. These reasons can be grouped into four categories. First, concerning the AOL agreement, defendant's allegedly understated the expense of the agreement in 2001 by $2.179 million, and misrepresented it as a benefit to SPSS rather than

a worthless alliance. Second, SPSS defendants allegedly made a number of financial misstatements in 2001. They overstated annual revenue by $2.5 million, understated the net loss by $5.16 million, and understated the loss per share by $0.38. Third, they engaged in accounting manipulations allowing them to understate income tax expenses by $1.888 million and license fee revenues by $509,000, and improperly used deferred revenue to overstate 2001 revenue by $3 million. Finally, SPSS defendants allegedly made a number of false statements concerning the methods used to report its finances. Plaintiff contends defendants falsely stated that the interim financial statements were a fair representation of SPSS' finances, that its audited financial statements complied with GAAP, and that it had tested its goodwill for impairment. According to plaintiff, because SPSS defendants violated GAAP and their own accounting principles, they overstated SPSS' revenue, inflating the earnings per share, without which the company would have failed to meet performance expectations.

SPSS defendants argue that plaintiff's pleadings must be dismissed because they improperly group all the defendants together, rather than specifically identify who engaged in the various misconduct. In a securities fraud action, group pleading "creates the presumption that senior executives of a corporation may be held liable for misrepresentations or omissions contained in public statements that are attributable to or issued by a corporation." Johnson v. Tellabs, Inc., 262 F.Supp.2d 937, 946 (N.D.Ill. 2003). Some courts have found that this does not satisfy the strictures of the PSLRA. See e.g., Geinko v. Padda, 2001 WL 1163728 at *4 n.3 (N.D.Ill. 2001); Chu v. Sabratek Corp., 100 F.Supp.2d 827, 835-37 (N.D.Ill. 2000). In Johnson, the court recognized that there is an unresolved conflict among district courts concerning the viability of group pleading following the passage of the PSLRA. 262 F.Supp.2d at 946. While the Johnson court did not rule on the issue, it found that

plaintiff's allegations were nonetheless insufficient because even if group pleading was acceptable, the PSLRA still required facts that supported "an inference that the statement is attributable to individual defendants." *Id.*

Though plaintiff refers to the SPSS defendants as a group throughout his complaint, this does not warrant dismissal. Unlike in <u>Johnson</u>, plaintiff has stated facts that create an inference that the individual defendants played a role in the issuance of the relevant statements. Plaintiff alleges that all of the SEC filings were signed by both Noonan and Hamburg. Furthermore, all the press releases contained comments by one of the men on the earnings results. These facts provide more than just their titles of chief executive officer and chief financial officer to link them to the financial statements. Nonetheless, while we do not dismiss plaintiff's claims on this basis, we do note that by defining "defendants" to include KPMG, plaintiff has technically made many inapplicable claims against the accounting firm, a result that we treat as inadvertent.

SPSS defendants also contend that plaintiff fails to sufficiently identify their false statements. The PSLRA requires plaintiff to specify each statement alleged to have been misleading, and the reason why it is misleading. 15 U.S.C. § 78u-4(b)(1). Citing to <u>Clark v. TRO Learning, Inc.</u>, 1998 WL 292382 at *4 (N.D.Ill. 1998), defendants argue that plaintiff's failure to specifically identify their false statements is fatal to plaintiff's claim. Plaintiff does paint his claims with rather broad strokes. In paragraphs 44 through 58 of his complaint, plaintiff provides a summary of ten documents issued by SPSS between May 2001 and April 2002, and then states that all of these statements are false, due, for the most part, to the fact that SPSS later restated its finances for this time period. These paragraphs contain statements by defendants that are not subject to plaintiff's allegations. For example, nothing in the

complaint challenges the veracity of Noonan's statement from the May 2, 2001, press release that "[t]his quarter was a tough quarter for us," or from July 31, 2001, that "[t]he business climate for software continues to be bad," or from October 30, 2001, that one positive from the quarter "was the increase in sales of [SPSS'] data mining products, particularly to agencies of the United States Federal Government at the end of its fiscal year." By failing to identify with precision the allegedly false statements, plaintiff includes a number of statements for which he clearly did not allege facts to support a fraud claim.

Although the complaint does not isolate every allegedly false statement by defendants, and then provide a reason for its falsity, plaintiff does list various statements from the press releases and SEC filings, and then provide a series of reasons why the statements as a whole are misleading. In Chu, 100 F. Supp. 2d at 820-21, the court found that the complaint satisfied the PSLRA where it identified certain financial statements as false because they included inflated revenues. The court held that details such as the amount by which the defendant corporation had misstated its finances were unnecessary for the plaintiffs to meet their burden. Id. at 821; Danis, 73 F.Supp.2d at 935 n.6. As in Chu, plaintiff does identify the false financial statements, such as the First Quarter 2001 Form 10-Q, and alleges that the figures are false, in light of the subsequent restatements. The pleadings could have been more exact by eliminating reference to statements that do not serve as a basis for plaintiff's claims, but this does not justify dismissal. The crux of plaintiff's allegation is clear – the financial statements included in 2001 earnings releases, Form 10-Q's and the Annual Report, were false, as evidenced by the fact that they were subsequently restated.

Next, defendants attack plaintiff's allegations of accounting manipulations and GAAP violations in particular. SPSS defendants contend that plaintiff's complaint is devoid of

specific facts to support his allegations that they improperly manipulated deferred revenue, income taxes and license fee revenues, in order to overstate revenue. They further contend that plaintiff has not provided facts necessary to state a claim concerning GAAP violations.

The most perplexing of these allegations involves SPSS' understatement of license fee revenues. Though plaintiff claims that SPSS defendants overstated license fee revenue in documents from 2002 and 2003 that we do not consider, he alleges that they understated this revenue by $509,000 in 2001. It is difficult to understand how this allegation supports plaintiff's contention that SPSS defendants misstated the company's financials in order to inflate the price of its stock. Understating its revenue certainly does not serve that purpose. Plaintiff has provided no facts concerning this misstatement to conclude otherwise. This understatement of revenue amounting to less than 0.3% of SPSS' restated revenue for 2001, leads one to infer not that SPSS purposely manipulated its financials, but that reporting errors occurred.

Plaintiff's allegations concerning defendants' other manipulations of deferred revenue and tax expenses, support rather than conflict with his claims. Yet, defendants contend that they are not sufficiently pleaded. They cite a lack of details concerning how a manipulation of deferred revenue took place, and argue that the restatement of SPSS' tax expenses does not give rise to a fraud claim. However, at the moment we are only addressing whether plaintiff has cleared the initial hurdle of identifying a false statement of material fact made by defendants. Since SPSS restated its deferred revenue and income tax expenses for 2001, its earlier representations concerning these figures were false.

Plaintiff also alleges violations of GAAP. He argues that these violations are relevant for both establishing a false statement of material fact by SPSS defendants and for establishing

their *scienter*. We will address the import for *scienter* later. Plaintiff contends that SPSS defendants represented that their 2001 Form 10-K was prepared in accordance with GAAP, even though it was not. Plaintiff's allegations concerning defendants' GAAP violations are too vague to support his claim of material misrepresentations.

The complaint devotes a section to defendants' GAAP violations, alleging that defendants failed to present a true representation of SPSS' operations and failed to correct its financial results before the March 2004 announcement that financial restatements would be forthcoming. Plaintiff seemingly maintains that the financial restatements themselves are evidence that defendants violated a bevy of accounting principles from the requirement that financial reports provide "information that is useful to present and potential investors and creditors in making rational investment, credit and similar decisions" to the principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered." Plaintiff does not state how defendants violated these or most other GAAP enumerated in the pleadings. Instead, the complaint places allegations concerning SPSS' financial restatements and a recitation of various GAAP side-by-side, and expects the reader to make the connection. That does not suffice for a fraud action. Plaintiff must connect specific GAAP violations to SPSS defendants' conduct. The restatement of SPSS financials does not on its own establish violations of GAAP.

One of the only alleged GAAP violations that plaintiff actually links to SPSS defendants' conduct is the improper recognition of revenue. Plaintiff contends that contrary to accepted financial accounting concepts, SPSS defendants booked revenue for the company before it was realizable and earned. Plaintiff supports this allegation with the statements of confidential witnesses. While some courts have required that plaintiffs name confidential

sources in their complaints, *see* <u>In re Silicon Graphics Inc. Sec. Litig.</u>, 970 F.Supp. 746, 763 (N.D.Cal. 1997), the Second and Fifth Circuits have allowed confidential witnesses to go unnamed, *see* <u>Barrie v. Intervoice-Brite, Inc.</u>, 397 F.3d 249, 259 (5th Cir. 2005); <u>Novak v. Kasaks</u>, 216 F.3d 300, 314 (2d Cir. 2000). In the Fifth Circuit, plaintiffs may rely on unnamed confidential witnesses as long as other facts provide a basis for believing that defendants' statements were misleading, or as long as the confidential witnesses are sufficiently described to support the probability that they would have the information alleged concerning defendants' actions. <u>Barrie</u>, 397 F.3d at 259; <u>Hallberg v. American Agencies General Agencies, Inc.</u>, 2005 WL 563211 at *4 (N.D.Ill. 2005). The four confidential witnesses relevant to this discussion, CW-1 through CW-4, were all identified as former SPSS employees. The complaint states each of the confidential witnesses' positions, terms of employment, and locations. This is sufficient information to determine the probability that they would know about the SPSS sales department's practices in booking revenue.

Nonetheless, the allegations are insufficient to determine whether this constituted a GAAP violation because the complaint does not provide any factual allegations concerning the financial impact of these practices. As with the other GAAP violations, plaintiff forgoes providing necessary factual allegations, relying instead on the court to make connections unwarranted by the current pleadings. The complaint states that SPSS' financial restatements corrected a $5.79 million overstatement of deferred revenue during the course of three years. Without alleging any facts indicating their financial impact, the complaint also states that certain SPSS salespeople improperly deferred revenue from various sales. The unjustified inference is that these alleged practices caused the $5.79 million overstatement. In fact, we cannot determine from plaintiff's complaint if the alleged sales practices are even material to

the Rule 10b-5 claim, much less determine the specific impact that they had on SPSS's annual statements of deferred revenue.

Both plaintiff and defendants devoted a considerable portion of their briefs to arguing whether forward-looking statements concerning SPSS' performance could support plaintiff's securities fraud claim. While plaintiff asserts that none of the statements at issue is forward-looking, defendants assert that many are. Of the ten relevant documents on which plaintiff relies, only one press release, issued in October 2001[3], wholly concerns predictions as to SPSS' financial results.[4] The release warned that the company expected its earnings to be lower than analysts' estimates. These predictions suffer the same incongruence with plaintiff's overarching claims as the understatement of license revenue. They fail to support the contention that SPSS defendants were misleading investors to inflate the value of their stock shares. It is not apparent how predicting that SPSS would not meet analysts' estimates adds artificial value. But more significantly, these forward-looking statements are not actionable.

The PSLRA provides safe harbor for forward-looking statements "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C § 78u-5(c)(1)(A)(i); Johnson, 262 F.Supp. at 952. SPSS' press release contained a safe harbor clause. It warned that some of statements in the release were forward-looking and that such variables as market conditions, changes in demand, competition, product release schedules and currency

---

[3] Plaintiff alleges that the press release was issued on October 10, 2001, but the press release described is attached to SPSS defendants' motion to dismiss and is dated October 22, 2001.

[4] While some other documents contain forward-looking statements such as Noonan's comment in the press release from May 2, 2001, that "[w]e are also more confident than ever that demand for the analytical technology we provide will continue to grow and be there when we emerge from this economic climate," we are not concerned with these statements because plaintiff's allegations concerning pre-purchase statements do not challenge these statements.

fluctuations could cause actual company results to differ from predictions. This clause satisfies the PSLRA's requirements for invoking safe harbor, *see* In re Midway Games, Inc. Sec. Litig., 332 F.Supp.2d 1152, 1167 & n.6 (N.D.Ill. 2004), and thus plaintiff cannot base his § 10(b) claim on the forward-looking statements in this press release.

Defendants argue that other statements on which plaintiff relies are not actionable because they are "puffery," vague optimistic rhetoric. "Mere sales puffery is not actionable under Rule 10b-5." Eisenstadt v. Centel Corp., 113 F.3d 738, 746 (7th Cir. 1997)(*citations omitted*). In Eisenstadt, the Seventh Circuit found that a company's optimistic statements regarding an auction of its assets, which was not going as well as had been hoped, were puffery, and therefore not actionable. *Id.* The court explained that putting a "rosy face on an inherently uncertain process" is not actionable fraud and, in fact, investors expect no less from a publicly-held company. *Id.* at 746-47. "The question is whether [the company] said things that were so discordant with reality that they would induce a reasonable investor to buy the stock at a higher price than it was worth ex ante." *Id.* at 746. In Eisenstadt, the company had not said such things, for only hindsight would prove that the auction was not a successful venture, and "[h]indsight is not the test for securities fraud." *Id.*

While plaintiff has included statements by Noonan and Hamburg that qualify as puffery, the majority of these statements, as discussed above, are not seriously challenged by plaintiff, with one notable exception. Plaintiff contends that Noonan falsely stated that SPSS' agreement with AOL provided SPSS "[a]n even more dominant position as the analytical solutions provider to the market research industry." Even if plaintiff did provide specific facts to show that this was not the case, Noonan's statement qualifies as sales puffery. As in Eisenstadt, this language puts a vague positive spin on an uncertain endeavor. Plaintiff's

assertion that this agreement was worthless, appears to be nothing more than that – an unsupported assertion. Though plaintiff's factual allegations show that in the end the AOL agreement did not benefit SPSS as much as the SPSS defendants may have hoped, the 20/20 vision of hindsight cannot be used to bolster a fraud claim.

Plaintiff makes one other allegation concerning the AOL agreement during the relevant time period. He maintains that certain pre-purchase statements by SPSS defendants understated the cost of the AOL agreement in 2001 by $2.179 million. Like most of plaintiff's other allegations of false statements concerning SPSS' finances, this is based on the company's financial restatement filed with the SEC on Form 10-K on July 29, 2004. SPSS had announced nine months earlier, on October 15, 2003, that it was amending its contract with AOL, and that this would affect its balance sheet. Since the accounting for the agreement was linked to the length of its term, the reduction of its term altered the previously calculated finances. As a result, the cost of the agreement for 2001 increased by $2.179 million. Contrary to plaintiff's allegation, SPSS defendants did not make a false statement in 2001, understating the agreement's cost. Plaintiff has provided no evidence that the cost of the agreement was anything other than what they reported. It was not until the agreement was amended two years later that the cost of the agreement increased over the term of its life. As the statement concerning this cost was not false at the time it was made, it cannot serve as the basis for a securities fraud action.

### *Scienter*

Since plaintiff has sufficiently alleged some false statements of material fact, we must now determine whether he sufficiently pleads defendants' *scienter*. For § 10(b) and Rule 10b-5 claims, *scienter* is a "mental state embracing intent to deceive, manipulate, or defraud." Ernst

& Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976); *see* Foss v. Bear, Stearns & Co., Inc., 394 F.3d 540, 541 (7th Cir. 2005)("There is no violation of § 10(b) without fraud and no fraud without deceit."). While Hochfelder did not resolve whether reckless behavior created civil liability under § 10(b), the Seventh Circuit has since held that reckless disregard for the truth establishes intent for purposes of the statute. Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1044-45 (7th Cir. 1977); Chu, 100 F.Supp.2d at 822-23. Recklessness is highly unreasonable conduct beyond simple or even inexcusable negligence that represents an extreme departure from the standards of ordinary care, such that its danger is either known to the defendant or so obvious that the defendant must have been aware of it. Sundstrand Corp., 553 F.2d at 1045; Chu, 100 F.Supp.2d at 823 (quoting Rehm v. Eagle Finance Corp., 954 F.Supp. 1246, 1255 (N.D.Ill. 1997)).

The PSLRA raised the bar for pleading *scienter* in securities fraud actions, no matter whether plaintiff alleges that a defendant acted knowingly or recklessly. Facts that afford a belief that plaintiff could prove *scienter* do not suffice. *See* Chu, 100 F.Supp.2d at 823. The complaint must plead facts that give rise to a strong inference that defendants acted with *scienter*. 15 U.S.C. § 78u-4(b)(2). As the Seventh Circuit has not addressed what constitutes a strong inference of *scienter*, district courts have looked outside this circuit for guidance. A standard adopted by the Second Circuit is most often cited. *See* Riggs Partners, LLC. v. Hub Group, Inc., 2002 WL 31415721 at *4 (N.D.Ill. 2002); Lindelow v. Hill, 2001 WL 830956 at *6 (N.D.Ill. 2001); Rehm, 954 F.Supp. 1246, 1255 (N.D.Ill. 1997). Under the Second Circuit's standard, in order to establish a strong inference of *scienter* plaintiff must allege 1) facts that show defendants had a motive and opportunity to commit fraud, or 2) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Shields v. Citytrust

Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). Some courts have emphasized that while the Second Circuit's standard is instructive, the PSLRA only requires a strong inference of *scienter*, not specific types of facts that create the inference. Chu, 100 F.Supp.2d at 823; Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp., 247 F.Supp.2d 987, 997 (N.D.Ill. 2002). Whether the plaintiff alleges motive, opportunity or circumstantial evidence, our inquiry is whether he has pleaded facts to create a strong inference that defendants knowingly or recklessly misled investors. The strength of an inference depends on how closely it follows from a fact. *See* Helwig v. Vencor, Inc., 251 F.3d 540, 553 (6th Cir. 2001). Thus, to satisfy the PSLRA, fraudulent intent must be the most reasonable of competing inferences to follow from plaintiff's facts. Anderson v. Abbott Laboratories, 140 F.Supp.2d 894, 910 (N.D.Ill. 2001); Helwig, 251 F.3d at 553.

Plaintiff argues that Noonan and Hamburg had the motive and opportunity to commit fraud, and that circumstantial evidence supports the conclusion that they did knowingly mislead investors. Before addressing plaintiff's assertions, we must discuss one fact that does not support an inference of *scienter* – SPSS' restatement of finances. As the Seventh Circuit has observed, "Restatements of earnings are common." Goldberg v. Household Bank, F.S.B., 890 F.2d 965, 967 (7th Cir. 1989). The restatement itself does not create an inference of wrongdoing, except in cases of gross financial misstatements. *See* Chu, 100 F.Supp.2d at 824 ("A company's overstatement of earnings, revenues, or assets in violation of GAAP does not itself establish scienter."); *but see* In re Spiegel, Inc. Sec. Litig., 2004 WL 1535844 at *25 (N.D.Ill. 2004)(finding a strong inference of *scienter* where defendants missed an understatement of $3 billion in debt and an overstatement of $240 million in revenue because "[t]he more serious the error, the less believable are defendants' protests that they were

completely unaware of [the company's] true financial status." (quoting Rehm, 954 F.Supp. at 1256.)). Where the financial revisions are not unusually large, plaintiffs have more of an uphill battle in establishing *scienter*. *See* Goldberg, 890 F.2d at 967. Restatements establish that misleading statements were made, but it provides no assistance in determining the intent behind the misstatements. While plaintiff does not plainly state that the revised figures lead to an inference of malfeasance, the notion permeates some of his arguments. He maintains that Noonan and Hamburg's preparation and oversight of the financial statements and their disregard of red flags give reason to infer *scienter*. But, plaintiff's red flags appear to arise out of the later discovery that the financials were incorrect. He provides no facts to draw the conclusion that defendants recognized red flags and ignored them before releasing the 2001 statements. Viewing their oversight of the financial statements as evidence of *scienter* presupposes that there was fraud afoot – fraud that they must have been aware of since they were privy to the finances. However, "[a] pleading of *scienter* may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." Johnson, 262 F.Supp.2d at 957 (quoting Abrams v. Baker Hughes Inc., 292 F.3d 424, 432 (5th Cir. 2002)). Permutations of "fraud by hindsight" do not create an inference, much less a strong inference, of *scienter*. We now turn to plaintiff's other facts.

The complaint alleges that SPSS defendants shared certain motives to inflate the stock price – increased compensation for the officers, an ability to meet analyst expectations, and increased company buying power afforded by an overvalued stock. Just as these broad motives apply to SPSS defendants, they easily apply to a majority of corporate executives. The desire to increase the value of a company and attain the benefits that result, such as meeting analyst expectations and reaping higher compensation, are basic motivations not only of fraud,

but of running a successful corporation. Were courts to accept these motives as sufficient to establish *scienter*, most corporate executives would be subject to such allegations, and the heightened pleading requirements for these claims would be meaningless. Thus, courts have repeatedly rejected plaintiff's allegations as sufficient to establish *scienter*. *See e.g.*, Chu, 100 F.Supp. 2d at 841("[A]s such they do not even remotely suggest fraudulent motivation."); In re Next Level Systems, Inc., 1999 WL 387446 at *9 (N.D.Ill. 1999)("[A]llegations of motives that are generally held by similarly positioned executives and companies are insufficient to sustain a claim under the securities laws." (*citation omitted*)); Novak, 216 F.3d at 307 ("Plaintiffs could not proceed based on motives possessed by virtually all corporate insiders, including: (1) the desire to maintain a high corporate credit rating or otherwise sustain 'the appearance of corporate profitability, or of the success of an investment, and (2) the desire to maintain a high stock price in order to increase executive compensation, or prolong the benefits of holding corporate office." (*internal citations omitted*)).

Plaintiff cites cases that state that unduly lavish compensation packages coupled with the timing of overstated corporate earnings can lead to an inference of *scienter*. *See* In re K-Tel Inter., Inc. Sec. Litig., 300 F.3d 881, 894 (8th Cir. 2002); Florida State Board of Admin. v. Green Tree Financial Corp., 270 F.3d 645, 661 (8st Cir. 2002). Nonetheless, in In re K-Tel Intern., the court states that even though a compensation package that allows a defendant to "benefit to an unusual degree" may support *scienter* pleadings, general desires to keep stock prices high to make the company appear profitable or to increase officer compensation are insufficient motives to support a finding of *scienter*. *Id.* at 894. Plaintiff has not pleaded any facts to support the notion that the individual defendants personally benefitted from the increased stock price to a degree outside an accepted range for corporate executives of

similarly sized companies.

Plaintiff levies a specific allegation of motive against Noonan – the sale of his SPSS stock at an inflated price. The complaint states that Noonan sold 28,487 shares of SPSS common stock between August 8, 2003, and December 23, 2003, for $541,768. Noonan sold 14,810 of those shares after SPSS had announced that its agreement with AOL had been amended and its financials would be restated, but before the full extent of those restatements had been fully disclosed. Insider trading alone does not raise an inference of *scienter*. Johnson, 262 F.Supp.2d at 955 (citing In re Navarre Corp. Sec. Litig., 299 F.3d 735, 747 (8th Cir. 2002); Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1037 (9th Cir. 2002)); In re Motorola Sec. Litig., 2004 WL 2032769 at *34 (N.D.Ill. 2004); Anderson, 140 F.Supp.2d at 910. As stated above, the strength of an inference depends on how closely it follows from a fact. Without more, an executive's sale of stock does not lead to the conclusion that he engaged in fraud. The sale must be suspicious in scope or timing to support an inference of *scienter*. Johnson, 262 F.Supp.2d at 955-56; In re Motorola, 2004 WL 2032769 at *34. The complaint states that Noonan never before sold any of his SPSS common stock, though plaintiff does not argue this point in his brief, and defendants assert that public records prove that he had sold comparable amounts of stock in previous years. If Noonan never had sold stock before, this would bolster the relevance of this sale for purposes of *scienter*. Nonetheless, two other circumstances deflate its impact. The bulk of the sale of stock was not timed to maximize Noonan's personal benefit. Plaintiff alleges that since the sale occurred after the October 15, 2003 announcement concerning the amended agreement with AOL, Noonan knew that a restatement of finances was in the offing, but so did the public, thanks to the press release and Form 8-K filed with the SEC. Furthermore, the absence of insider trading by Hamburg undermines an inference of

*scienter. See* <u>San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co., Inc.</u>, 75 F.3d 801, 814 (2d Cir. 1996)("[T]he sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive.") If Noonan and Hamburg were acting in concert to inflate SPSS' stock price and increase their personal wealth, why would Hamburg hold on to stock that he allegedly knew would fall from its inflated price? *Scienter* is not the most reasonable inference from Noonan's sale.

Plaintiff also relies on allegations that SPSS defendants violated GAAP to support his claim of *scienter*. While violations of GAAP provide some evidence of *scienter*, they fall far short of raising a strong inference of knowing or reckless misrepresentation. <u>Stavros v. Exelon Corp.</u>, 266 F.Supp.2d 833, 850 (N.D.Ill. 2003); <u>Chu</u>, 100 F.Supp.2d at 838; <u>Danis v. USN Communications, Inc.</u>, 73 F.Supp.2d 923, 940 (N.D.Ill. 1999). The degree to which a GAAP violation supports an inference of *scienter* is further diminished where it is based on a "relatively insignificant error." <u>Stravos</u>, 266 F.Supp.2d at 851. In <u>Stavros</u>, the plaintiffs alleged that the defendants improperly recorded a $10 million gain during the first quarter of 2001, inflating their company's net income and violating GAAP. *Id.* The court found that this artificial gain of less than 3 per cent of the company's net income did not raise a strong inference of *scienter. Id.* (citing <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d 185, 206 (1st Cir. 1999)(finding no strong inference of *scienter* where revenue was artificially inflated by 4 per cent); <u>In re Allscripts, Inc. Sec. Litig.</u>, 2001 WL 743411 at *10 (N.D.Ill. 2001)(where improperly recognized revenue was 4 per cent of company's revenue for the quarter "the alleged improperly recognized sum cannot as a matter of law be material."). As in <u>Stavros</u>,

SPSS defendants' alleged mistatement of 2001 revenue in violation of GAAP was minor – approximately 1.4 per cent of SPSS' restated revenue for the year. Furthermore, as explained above when addressing plaintiff's allegations of false statements of material fact, the pleadings concerning GAAP violations are too vague and insufficiently tied to defendants' alleged conduct to support a Rule 10b-5 claim against SPSS defendants. Thus, alleged GAAP violations do not support a strong inference of *scienter*, even when taken with plaintiff's prior allegations.

Finally, plaintiff argues that the statements of various confidential witnesses create a strong inference of *scienter*. According to the complaint, these former SPSS employees have verified that Noonan and Hamburg knew that SPSS salespeople improperly booked revenue. In light of the confidential witnesses' assertions, plaintiff argues that Noonan and Hamburg knowingly misrepresented SPSS' financials. SPSS defendants contend that plaintiff fails to plead the facts necessary to support his confidential witnesses' allegations, and therefore their assertions do not create a strong inference of *scienter*. We have already found that the confidential witnesses' assertions, as alleged in the complaint, fail to sufficiently support the claim that SPSS defendants made a false statement concerning their conformity with GAAP. We now find that they also fail to establish defendants' *scienter* for any material misrepresentations.

As to Noonan, the allegations are clearly insufficient. The complaint states that CW-1, SPSS' sales director for the federal government division from the fall of 2000 until the end of 2001, and CW-3, SPSS' vice-president of strategic planning from October 2000 through January 2002, maintain that Noonan was aware that the sales department prematurely booked revenue. No factual allegations are provided to support this assertion, such as an explanation

as to how they know this. Attributing this claim to CW-1 and CW-3 does not relieve plaintiff of the burden of pleading facts in support of this bald assertion.

Plaintiff provides more support for CW-1's claim concerning Hamburg, yet it too fails. CW-1 asserts that Hamburg was also aware that the sales department inflated revenues by improperly booking sales. As to Hamburg, the complaint explains CW-1's basis for this allegation. In September 2001, CW-1 informed Hamburg in writing that Arleen Garcia, head of SPSS' sales department, was directing her employees to inflate sales results. According to the complaint, CW-1 told Hamburg that employees falsified sales numbers by entering non-existent orders and prematurely booking revenue. In response to this information, Hamburg allegedly told CW-1 that if she could not work with her superior she would have to quit. CW-1 asserts that no investigation occurred and these sales practices continued until she left SPSS at the end of 2001.

While the complaint provides factual allegations of Hamburg's knowledge of improper practices in the sales department, it does not provide any indication of the scope or impact of these sales practices. Without sufficient detail concerning the effects of these practices, we do not know what relevance they had on SPSS' bottom-line and, therefore, whether or not they were material for the company's financial statements. Plaintiff presents Hamburg's knowledge of these practices as knowledge that statements in press releases and SEC filings regarding SPSS' revenues were incorrect, but without some indication of the financial impact of these practices this leap can not be made. Perhaps, salespeople improperly booking deferred revenue to win monthly bonuses had a trivial effect on SPSS' finances. As the complaint is silent concerning the financial impact of these practices, we are left to guess. In the absence of some factual allegation, we will not assume that the sales practices advocated

by Garcia triggered the $5.79 million restatement of deferred revenue. Thus, the confidential witnesses' assertions that Noonan and Hamburg knew of the sales department's practices do not sufficiently plead their *scienter* for violation of § 10(b) and Rule 10b-5. Given that plaintiff has failed to sufficiently plead *scienter* against either Noonan or Hamburg, count I against SPSS defendants is dismissed for failure to plead in accord with Rule 9(b) and the PSLRA

## Section 20(a) of the Securities Exchange Act

Noonan and Hamburg also seek to dismiss count II of plaintiff's complaint, violation of section 20(a) of the Securities Exchange Act. Section 20(a) states: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). To state a section 20(a) claim against Noonan and Hamburg, plaintiff must allege a primary security violation, each defendants' exercise of general control over SPSS, and each defendants' "power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 881 (7th Cir. 1992); *see* Zurich Capital Market Inc. v. Coglianese, 332 F.Supp.2d 1087 (N.D.Ill. 2004). As the complaint fails to sufficiently plead a § 10(b) and Rule 10b-5 claim against either Noonan or Hamburg, plaintiff has not alleged a primary security violation on which to base its section 20(a) claim. Count II is dismissed as to both individual defendants.

## KPMG's Motion to Dismiss

Plaintiff alleges that KPMG, SPSS' outside auditor, also played a role in the artificial

inflation of the company's stock price. The complaint states that KPMG disregarded its obligation to properly audit SPSS' financial statements and instead rubber-stamped them, allowing the company to conceal its fraud. Plaintiff references KPMG's assistance in the preparation and review of SPSS' quarterly financial statements and Forms 10-Q, and its audit of SPSS' Forms 10-K, which also included KPMG's unqualified audit opinions. Plaintiff's complaint states that KPMG deliberately or recklessly violated generally accepted auditing standards (GAAS) and ignored numerous red flags when performing its audit. Had it not done so, plaintiff argues, it would have discovered SPSS' fraud. Plaintiff contends that KPMG's GAAS violations and disregard for red flags reveal that it knew or was reckless in not knowing that its audit opinions concerning SPSS were false. KPMG moves to dismiss plaintiff's § 10(b) and Rule 10b-5 claim against it.

First, we must determine what statements by KPMG are relevant to our inquiry. In its section on KPMG's liability, the complaint mentions SPSS' unaudited quarterly financial statements that KPMG allegedly helped to prepare and then reviewed. However, plaintiff's response to the motion to dismiss clarifies that its § 10(b) claim against the auditor rests only on statements from the audited Forms 10-K for 2001 and 2002, not the unaudited quarterly statements. Of the two Forms 10-K filed during the alleged class period, we only consider the form filed with the SEC on April 1, 2002. The Form 10-K for 2002 was filed on April 2, 2003, eleven months after plaintiff purchased his shares of SPSS stock. As explained at length above, plaintiff cannot base a § 10(b) or Rule 10b-5 claim against defendant for a statement made after his stock purchase, and he does not have standing to bring the claim for unnamed investors who made later stock purchases. *See* Roots Partnership, 965 F.2d at 1420. KPMG's allegedly false statements from the 2001 Form 10-K are that it conducted the audit of SPSS'

annual report in accordance with GAAS, and that in its opinion SPSS' financial statements fairly presented the financial status of the company in accordance with GAAP.

In its motion to dismiss, KPMG argues that the complaint fails to allege facts sufficient to establish a strong inference of the auditor's *scienter*. Plaintiff contests this assertion, arguing that the complaint sufficiently pleads KPMG's reckless disregard for the truth, which serves as intent for § 10(b) claims. *See* <u>Sundstrand Corp.</u>, 553 F.2d at 1044-45. When applied to outside auditors, courts have stated that "recklessness means that 'the accounting firm practices amounted to no audit at all, or to an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." <u>In re Spiegel</u>, 2004 WL 1535844 at *39 (quoting <u>Wafra Leasing Corp. 1999-A-1</u>, 247 F.Supp.2d at 998). Under the PSLRA, plaintiff must plead facts that give rise to a strong inference of KPMG's recklessness. *See* <u>Chu</u>, 100 F.Supp.2d at 823.

Plaintiff contends that SPSS defendants' GAAP violations, KPMG's GAAS violations, and the auditor's disregard of various red flags provide the factual basis to infer that KPMG recklessly made false statements in SPSS' 2001 Form 10-K. As discussed in our analysis of SPSS defendants' motion to dismiss, plaintiff has not sufficiently pleaded the alleged GAAP violations to support his § 10(b) claim against them. Plaintiff's allegations of KPMG's GAAS violations are similarly vague, lacking factual allegations that link the auditor's conduct to a breach of standard. For example, plaintiff alleges that KPMG failed to ensure that adequately trained employees performed the audit, failed to sufficiently plan for the audit, failed to maintain an independent mental attitude, and failed to consult enough evidential material before issuing its opinion. Plaintiff provides no factual allegations to support these assertions,

such as who conducted the audit, their training and experience, the planning they conducted, and the materials and evidence they reviewed during their audit. While it is understandable that plaintiff is not privy to much of this information at this stage, thus explaining why he is pleading on information and belief, he must provide some basis for his belief. He wholly relies on the fact that, despite KPMG's audit and unqualified opinion, SPSS later restated its finances. Since SPSS restated its finances, we are expected to assume that GAAS were violated, regardless of whether there are any factual allegation to support this position. Such an assumption is unwarranted.

Even if plaintiff's allegations of GAAP and GAAS violations were sufficiently pleaded, they would not on their own establish a strong inference of *scienter*. In re First Merchants Acceptance Corp. Sec. Litig., 1998 WL 781118 at *10 (N.D.Ill. 1998)("[A] plaintiff cannot show scienter merely by stating that a defendant violated GAAP."); In re Spiegel, 2004 WL 1535844 at *39 ("Allegations that a defendant violated [GAAP and GAAS] are generally insufficient, standing alone, to create a strong inference of scienter." (*internal citation omitted*)). However, in conjunction with other factual allegations, these violations may lead to such an inference. Plaintiff argues that KPMG's disregard of numerous red flags when conducting its audit provides the additional factual allegations necessary to establish a strong inference of *scienter*. We disagree.

Red flags are "specific, highly suspicious facts and circumstances available to the auditor at the time of the audit." Riggs Partners, LLC. v. Hub Group, Inc., 2002 WL 31415721 at *9 (N.D.Ill. 2002). Four of plaintiff's six alleged red flags are the restatements of SPSS' deferred revenue, tax expenses, license fee revenue, and goodwill. SPSS' restatement of its finances in 2004 could not serve as a red flag to KPMG as it audited the company's

financial statements and issued its auditing opinion in 2001 and early 2002. As with the SPSS defendants, plaintiff attempts to rely on these restatements to prove KPMG's *scienter*, but the restatements are merely evidence that certain categories of SPSS' finances were incorrect, not that the cause of those inaccuracies was fraud. Another alleged red flag – the premature termination of SPSS' agreement with AOL resulting in the recalculation of goodwill, intangible assets and expenses – suffers the same deficiency as the restatement red flags: it was not a fact available to KPMG at the time of its audit. That SPSS decided to renegotiate its agreement with AOL because it was not as lucrative as predicted is not evidence that KPMG engaged in fraud. KPMG does not have the burden of prescience.

Finally, plaintiff alleges that KPMG was aware that Hamburg, SPSS' chief financial officer, was not qualified for his job. The complaint states that Hamburg told a securities analyst, now one of plaintiff's confidential witnesses (CW-5), that KPMG informed the SPSS board of directors that "Hamburg was not qualified to be CFO and should be replaced so the Company could go to the next level." Plaintiff's complaint alleges that KPMG later reversed its opinion of Hamburg. Hamburg retained his position as chief financial officer until his retirement on August 11, 2004. As with the other red flags there is a timing issue. Plaintiff has not alleged sufficient details concerning this red flag, such as who at KPMG stated that Hamburg was unqualified, where they stated this, and most importantly when the auditor came to this conclusion. Unless KPMG reached this determination before issuing its audit opinion on April 1, 2002, it is not relevant to our analysis. As the complaint is silent on this fact, we cannot determine whether it was a consideration available to KPMG at the time of the audit.

Moreover, even if KPMG did issue this statement and retraction before SPSS filed its

Form 10-K in April 2002, it would not be enough to create a strong inference of *scienter*. KPMG allegedly told the SPSS board of directors that Hamburg was unqualified to hold his position and could not take the company "to the next level." This language indicates KPMG's concern for SPSS' future growth and development, rather than a concern for the accuracy of its stated finances. This red flag stands in sharp contrast to the red flags discussed in cases upon which plaintiff relies. In both <u>Danis</u>, 73 F.Supp.2d at 923, and <u>In re First Merchants Acceptance Corp.</u>, 1998 WL 781118 at *1, the complaint alleged that the auditor was aware of specific deficiencies in its client's bookkeeping, but ignored these issues during its audit. In <u>Danis</u>, the auditor had recently prepared a comprehensive report finding problems with its client's internal accounting and billing controls. 73 F.Supp.2d at 942. The auditor allegedly disregarded these findings in preparing its audit. *Id.* In <u>In re First Merchants</u> the auditor was allegedly aware of a drastic increase in the bad debt write-offs and rate of delinquencies for its client, an automobile loan financing company. 1998 WL 781118 at *6, 11 n.5. Neither these red flags nor the weaknesses the auditor had previously found in the client's financial statements deterred it from certifying the company's Form 10-K. *Id.* at 6. Finally, in <u>In re Spiegel</u>, the auditor issued allegedly false audit opinions concerning its client's financial statements that overstated gains by $240 million and understated debt by $3 billion. KPMG's concern that SPSS' chief financial officer may not have been able to take the company "to the next level" is not akin to any of these red flags, nor is it sufficient to raise a strong inference of the independent auditor's *scienter*. Plaintiff has failed to plead facts that raise a strong inference of KPMG's *scienter*, thus count I against KPMG is dismissed.

## CONCLUSION

Both SPSS defendants' and KPMG's motions to dismiss are granted. As this is our first

ruling on the deficiencies of plaintiff's complaint, we dismiss it without prejudice and with leave to amend within 30 days.

James B. Moran
**JAMES B. MORAN**
**Senior Judge, U. S. District Court**

May 10 , 2005.