IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FRED DAVIS, individually and on behalf of all others similarly situated, </br></br>Plaintiff, </br></br>vs. </br></br>SPSS, INC., JACK NOONAN, EDWARD HAMBURG, and KPMG LLP, </br></br>Defendants. | No. 04 C 3427 |

## MEMORANDUM OPINION AND ORDER

Plaintiff Fred Davis filed the original complaint in this action on May 14, 2004, against SPSS, Jack Noonan, SPSS' president and chief executive officer, and Edward Hamburg, SPSS' vice-president, corporate operations, and chief financial officer, and SPSS' auditor, KPMG, alleging violations of §§ 10(b) and 20(a) of the Securities Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and the Securities and Exchange Commission (SEC) Rule 10b-5, 17 CFR § 240.10b-5. Plaintiff Davis was granted leave to amend, and filed the first amended complaint on September 30, 2004. After motions to dismiss the complaint in its entirety against all defendants were granted (Davis v. SPSS, Inc., 385 F.Supp.2d 697 (N.D.Ill.2005) (Davis I)), plaintiff filed a second amended complaint on June 24, 2005. Plaintiff's second amended complaint added AFCO LP as a named plaintiff and terminated its complaints against KPMG. Now, plaintiffs Davis and AFCO LP, individually and on behalf of all other purchasers of the common stock of SPSS, Inc. between May 2, 2001, and March 30, 2004, re-assert the same statutory and regulatory claims. Defendants move to dismiss the second amended complaint in its entirety. For the following reasons we grant the motion to dismiss and dismiss plaintiffs' complaint with prejudice.

## BACKGROUND

Because <u>Davis I</u> set out the first amended complaint's allegations in considerable detail, and found them substantially wanting, the analysis here can best be advanced by identifying the facts the second amended complaint has added to the "total mix" of the allegations. <u>TSC Industries, Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976). Additionally, we will analyze how <u>Makor Issue & Rights, Ltd. v. Tellabs, Inc.</u>, 2006 WL 172142 (7th Cir.2006), issued after our opinion in <u>Davis I</u>, impacts our analysis.

In plaintiffs' second amended complaint, plaintiff AFCO LP is added as a named plaintiff. AFCO purchased 837 shares of SPSS common stock at a price of $18.54 per share on October 29, 2003, 10 shares at a price of $18.53 on October 30, 2003, 415 shares at a price of $20.95 on January 23, 2004, and 416 shares at a price of $14.02 on January 27, 2004. The addition of AFCO saved plaintiffs' second amended complaint from the standing problems that arose in the court's analysis of the first amended complaint.

Plaintiffs' second amended complaint once again asserts that the head of the SPSS sales department, Arleen Garcia, was prematurely booking sales in order to artificially inflate her sales for each quarter. Plaintiffs contend that Garcia's actions artificially inflated SPSS' financial data and caused SPSS' massive $5.709 million overstatement. Plaintiffs allege that defendants were aware of Garcia's fraudulent practices and their impact on SPSS' financial data. Pointing to statements in SPSS' press releases, and documents filed with the SEC stating financial results for various time periods[1], plaintiffs allege that defendants knowingly touted artificially-inflated financial data and optimistic predictions for the future to induce investors

---

[1] For a complete list of these documents, see <u>Davis I</u>, 385 F.Supp.2d at 702. Plaintiffs' second amended complaint indicates that the press release identified as released on October 10, 2001 (#5), was actually released on October 22, 2001. All other documents are identical.

to purchase SPSS stock.

In their attempt to sufficiently allege violations of § 10(b) and Rule 10b-5, plaintiffs point to allegations of confidential witnesses, defendants' financial and professional motives, and SPSS' violations of generally accepted accounting principles (GAAP). In addition to the four confidential witnesses previously identified, plaintiffs add confidential witness 5. CW-5 was an account manager for the federal healthcare sector from August 1998 through August 2002, and claims that Garcia prematurely booked four or five separate sales to a large government agency. Along with the addition of CW-5, plaintiffs' second amended complaint includes additional details regarding the knowledge of the original four witnesses. For example, CW-3 alleges that Garcia booked numerous sales without signed orders, including at least one to the Healthcare Finance Administration (HCFA) of approximately $1.5 million. (cplt, at ¶ 21). Similarly, CW-2 claims that an HCFA representative called an SPSS sales representative to complain about a $280,000-$500,000 order that was shipped without HCFA authorization. (*Id.*, at ¶ 23). Finally, CW-1 indicated that he/she "is confident that this $5.709 million of improperly recognized revenue that was written off in the Company's restatement is directly attributable to Garcia's accounting manipulations" (*id.*, at ¶ 13), and CW-3 says that "SPSS management, including Hamburg, knew what was going on, but they ignored it 'because they wanted to inflate the numbers'"(*id.*, at ¶ 21).

## DISCUSSION

### Legal Standards

The legal standards for a motion to dismiss under FED. R. CIV. P. 12(b)(6) and the Private Securities Litigation Reform Act (PSLRA) are fully set forth in Davis I. With respect to the strict pleading hurdles set forth in the PSLRA, the complaint must "specify each

statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, with regard to the defendants' state of mind, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Thus, a complaint alleging violations of §10(b) and Rule 10b-5 must state, with particularity, that "(1) the defendant made a false statement or omission (2) of material fact (3) with *scienter* (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 648 (7th Cir.1997); In re HealthCare Compare Corp. Securities Litigation, 75 F.3d 276, 280 (7th Cir.1996). In this case, defendants argue that plaintiffs' allegations fail to plead each element with particularity. We will address each in turn.

Material Misstatement or Omission

Plaintiffs allege that "[t]hroughout the Class Period, Defendants engaged in a manipulative and deceptive scheme to artificially inflate the market price of the Company's common stock" (cplt, ¶ 4). In doing so, plaintiffs contend that statements made in press releases and forms filed with the Securities and Exchange Commission between May 2, 2001, and February 17, 2004, were false and misleading. Plaintiffs essentially re-allege the categories of liability expressed in their first amended complaint. With the omission of allegations that defendants understated the expense of the AOL agreement in 2001, and misrepresented that agreement as a benefit to SPSS, plaintiffs maintain their original categories of liability. Those

include the following: (1) financial misstatements; (2) accounting manipulations; (3) false statements concerning the methods used to report SPSS' finances; and (4) false predictions for the future based on artificially-inflated financial data.

With respect to the financial misstatements, plaintiffs again allege that defendants overstated deferred revenue by more than $5 million, overstated goodwill by more than $10.3 million, and understated income tax expenses by more than $5.2 million (cplt, ¶4). As in <u>Davis I</u>, we hold that because SPSS subsequently restated its financial data, plaintiffs have adequately pled a material misstatement or omission with respect to the financial misstatements, including misstatements of deferred revenue and tax expenses.

With respect to allegations of GAAP violations, false statements of methods and material omissions in defendants' statements of recollection and prediction, we will address the additional factual allegations included in the second amended complaint to determine whether plaintiffs have sufficiently cured the deficiencies of the first amended complaint.

<u>GAAP violations</u>

In <u>Davis I</u>, we found plaintiff's first amended complaint inadequate to surpass the initial hurdle of stating a material misstatement or omission because the "restatement of SPSS financials does not on its own establish violations of GAAP." <u>Davis I</u>, 385 F.Supp.2d at 710. We specifically addressed alleged accounting violations in connection with Garcia's practice of prematurely booking revenue before it was realizable and earned. We found that because plaintiff failed to provide any factual allegations concerning the financial impact of Garcia's practices on SPSS' overall financials, we were unwilling to infer that defendants' statements had any relationship to Garcia's alleged fraud. Nor did we allow defendants' statements that SPSS complied with GAAP to serve as the basis for plaintiff's Rule 10b-5 claims.

We first address whether plaintiffs have cured their pleading deficiencies with regard to accounting violations. In their second amended complaint, plaintiffs include allegations beyond the insufficient list of various GAAP provisions included in their first amended complaint. *See* Davis I, 385 F.Supp.2d at 710. Plaintiffs now allege that defendants utilized deferred revenue accounts to boost SPSS' financial results in violation of Staff Accounting Bulletin 101, understated SPSS' income tax expenses for 2001 and 2002 by more than $1.8 million and $3.36 million, respectively, in violation of Statements of Financial Accounting Standards 109, and overstated SPSS' license fee revenues for 2002 and 2003 by $2,000 and $967,000, respectively, in violation of Staff Accounting Bulletin 104. (cplt, ¶¶ 18-32). For the latter two, plaintiffs rely solely on SPSS' restatement of its financials to establish the GAAP violation. However, "[t]he restatement of SPSS financials does not on its own establish violations of GAAP." Davis I, 785 F.Supp.2d at 710. Thus, plaintiffs have failed to adequately plead violations of Financial Accounting Standards 109 and Accounting Bulletin 104.

That leaves us to consider whether plaintiffs adequately pled GAAP violations (specifically violation of Accounting Bulletin 101) with respect to Garcia's misconduct. Defendants argue that plaintiffs' allegations, based significantly on statements from five confidential witnesses, fail because the confidential witnesses lack any factual basis for their allegations. Defendants continue by asserting that without the confidential witness statements plaintiffs have no other factual basis for their allegations of accounting violations.

As we previously noted, "plaintiffs may rely on unnamed confidential witnesses as long as other facts provide a basis for believing that defendants' statements were misleading, or as long as the confidential witnesses are sufficiently described to support the probability that they would have the information alleged concerning defendants' actions." *Id.*, at 710 (*citing*

Barrie v. Intervoice-Brite, Inc., 397 F.3d 249, 259 (5th Cir.2005); Hallburg v. American Agencies General Agencies, Inc., 2005 WL 563211, *4 (N.D.Ill.20005)). *See also* Makor Issues & Rights, Ltd., 2006 WL 172142.

The complaint states certain details about each confidential witness, including job title, office location and dates of employment. It also gives details about how each witness knew of Garcia's policy of prematurely booking sales in order to increase SPSS' bottom line, meet sales goals and meet analysts' expectations. Although we already found that the confidential witnesses would have known about the SPSS sales department's practices in booking revenue,[2] defendants argue that they would not have had knowledge concerning the preparation of SPSS' financial statements or the materiality of the challenged practices to SPSS' overall financials. We agree that knowing the sales department practices does not establish that the witnesses were in a position to know whether Garcia's artificially-inflated sales translated into the misstated financial data complained about in this case. Vague statements like "CW-1 is confident that this $5.709 million of improperly recognized revenue that was written off in the Company's restatement is directly attributable to Garcia's accounting measures" (cplt., ¶ 13), are insufficient to establish how the witnesses knew that Garcia's conduct was material to the revenue overstatement. *See* City of Austin Police Retirement System v. ITT Educational Services, Inc., 388 F.Supp.2d 932, 943 (S.D.Ind.2005) ("The lack of allegations regarding how or why such employees would have access to the information they purport to possess is problematic because there is no way to tell if they are relaying information received first,

---

[2] Plaintiffs incorrectly read our order of May 10, 2005, to state that the confidential witnesses were in a position to know SPSS' accounting practices and how SPSS reported revenues. Plaintiffs overstate our comment. We noted that plaintiffs "provided sufficient information to determine the probability that the confidential witnesses would know about the SPSS sales department's practices in booking revenue." We did not state that plaintiff provided sufficient information to establish that the witnesses were in a position to know about the accounting practices or how the improperly booked revenue was later integrated into the company's worldwide financials.

second, or even third hand"). And although CW-5 "states unequivocally that these amounts were material to the Company's financial results because Garcia was prematurely booking 'six figure deals' rather than '$50,000 to $60,000 deals,'" much of the witness' knowledge came from his/her former co-workers, and not from himself/herself (cplt., ¶ 26). Although plaintiffs' second amended complaint included some additional details, without more information describing how the confidential witnesses came to these conclusions, we cannot find that they were in a position to give accurate information regarding the ways in which Garcia's actions were integrated into the financials, such that they were material to plaintiffs' injuries. *See* In re Metawave Comm. Corp. Sec. Litigation, 298 F.Supp.2d 1056, 1068 (W.D.Wash.2003) ("Plaintiffs must plead 'with substantial specificity' how confidential witnesses 'came to learn of the information they provide in the complaint.' The Court must be able to tell whether a confidential witness is speaking from personal knowledge, or 'merely regurgitating gossip and innuendo'"). Contrary to plaintiffs' contention, we do not agree that plaintiffs have sufficiently alleged either the particular financial transactions that caused the alleged misstatement of earnings, or the effect it had on the company's earnings (*see* plfs' response at 4). Therefore, because confidential witnesses' allegations cannot act as the factual basis for any specific accounting violation, we find that plaintiffs have failed to adequately plead such GAAP violations.

### False Statement of Methods

Plaintiffs also allege that defendants falsely stated that their financial statements were a fair representation of SPSS' finances, that its audited financial statements complied with GAAP, and that it had tested its goodwill for impairment. Plaintiffs point to representations on SPSS' 10-Q forms and Annual Reports as evidence.

In essence, plaintiffs allege that these statements were false and misleading because, in violation of GAAP, defendants did not account for Garcia's artificially-inflated sales figures in determining their financial data. Such contentions are predicated upon showing that there were in fact GAAP violations – that Garcia's artificial sales were actually incorporated into SPSS' financial data. Furthermore, the contentions are predicated upon showing that Garcia's sales were material in figuring SPSS' financial data. Because plaintiffs have not adequately pled any such accounting violation (*see* discussion above), their allegations that the statements made in 10-Q and Annual Report SEC filings are false and misleading cannot stand. *See* Cutsforth v. Renschler, 235 F.Supp.2d 1216, 1256 (M.D. Fla. 2002).

### Predictions For The Future

Finally, plaintiffs re-allege that specific remarks in SPSS' press releases were rendered false and misleading as a result of Garcia's prematurely-booked sales. Plaintiffs refer to the same press releases and SEC filings in their second amended complaint as in their first, but attempt to more fully explain why the statements are false and misleading. For example, plaintiffs suggest that defendant Noonan's statement: "I believe, however, that we are making the right moves to improve our operating performance in a very uncertain market" is "false and misleading because Noonan omitted the material facts that the 'moves' the Company was making included prematurely booking orders to artificially inflate revenues" (cplt., ¶ 49). Such opinions, however, are generally not actionable under § 10(b). *See* D.E.& J. Ltd. Partnership, 284 F.Supp.2d 719, 736 (E.D.Mich.2003) ("Material statements which contain the speaker's opinion are actionable under Section 10(b) only if the speaker does not believe the opinion and the opinion is not factually well-grounded").

Plaintiffs rely on In re Sears, Roebuck and Co. Sec. Litig., 291 F.Supp.2d 722, 726

(N.D.Ill.2003) to argue that because defendants were engaged in massive accounting fraud spanning almost three years, "Defendants did not believe these statements since they were aware of undisclosed facts that seriously undermine these statements" (plfs' response at 11-12). Plaintiffs are asking us to take too large a leap of logic. They are asking us to find that (1) they adequately pled Garcia's misconduct; (2) they adequately pled defendants' knowledge of Garcia's conduct; and (3) therefore, defendants could not have had an optimistic attitude regarding the future predictions of the company. We cannot find that plaintiffs' allegations lead us to this conclusion. Therefore, we cannot find that plaintiffs have adequately pled a strong inference of impropriety.

Plaintiffs also point to such statements as, "We did reasonably well this quarter given that March barely showed up .... This pre-March growth, combined with sales pipeline improvements and a lower cost base, makes me more confident than concerned about our ongoing performance this year" (cplt., ¶ 76). Statements such as the one quoted are non-actionable puffery. And, "[m]ere sales puffery is not actionable under Rule 10b-5." Davis I, 785 F.Supp.2d at 711 (citing Eisenstadt v. Centel Corp., 113 F.3d 738, 746 (7th Cir.1997)). See also Makor Issues & Rights, Ltd., 2006 WL 172142 at *6 ("If the statement amounts to vague aspiration or unspecific puffery, it is not material").

Finally, plaintiffs argue that statements such as defendant Hamburg's statement that, "In contrast, however, was the sequential and year-over-year growth seen by our SPSS BI division. They had a strong quarter selling to the United States Federal Government as well as reasonable revenues through their telesales channel with lower-priced product offerings," are actionable because they were made regarding actual past facts and are not optimistic predictions (plfs' response at 12). Although plaintiffs' argument is initially appealing,

defendants counter by establishing that the same press release contained forewarnings to potential investors, including a statement that the company's "[o]verall ... performance results will not be what we wanted or expected ..." (defs' mem. at 15). Thus, such a statement does not pass the materiality hurdle because it would not likely influence an investor. *See* In re Midway Games, Inc. Sec. Litigation, 332 F.Supp.2d 1152, 1164 (N.D.Ill.2004) ("Courts have held immaterial as a matter of law 'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available'").

*Scienter*

Because plaintiffs have sufficiently alleged some false statements of material fact – the financial misstatements, including misstatements of income tax and deferred revenue – we now turn to whether plaintiffs have sufficiently pled defendants' *scienter*.[3]

In Makor Issues & Rights, Ltd., the Seventh Circuit recently clarified its position regarding the *scienter* requirement of the PSLRA. In that case, the court sided with six other circuits in finding that under the PSLRA, courts should "examine all of the allegations in the complaint and then to decide whether collectively they establish" a strong inference of *scienter*. 2006 WL 172142 at *11. Additionally, the court held that a complaint should survive if "it alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent," as opposed to requiring that fraud be the most plausible of competing inferences. *Id.*, at *12.

In Davis I, decided prior to Makor Rights & Issues, Ltd., we found that plaintiff had not adequately pled *scienter* such that fraud was the most reasonable explanation for

---

[3] See Davis I, 385 F.Supp.2d 697, for a full discussion on the definition and application of *scienter* to this case.

defendants' conduct. We held that defendants' need to restate SPSS' financial data did not support an inference of *scienter*; that alleged motives of increased compensation, ability to meet analyst expectations, and increased company buying power were insufficient to establish *scienter*; that defendant Noonan's stock sale was not so suspicious so as to establish *scienter*; that where plaintiff was unable to adequately plead GAAP violations, such allegations could not support a finding of *scienter*; and that statements of confidential witnesses were insufficient to establish *scienter* because it was unclear how the confidential witnesses knew the information they disclosed or how Garcia's alleged misconduct impacted SPSS' financials. Nor did we find that, taking these allegations together, plaintiff adequately established the strong circumstantial evidence of conscious behavior or recklessness necessary to establish fraud.

Plaintiffs contend that in light of recent precedent, their confidential witnesses, taken alongside the restatement of financials, Noonan's stock sale and Hamburg's resignation, are sufficient to support a reasonable belief as to the misleading nature of defendants' statements. Makor Rights & Issues, Ltd., however, did not alter the PSLRA's stringent pleading requirement; plaintiffs must still meet the "strong inference" requirement contained in the statute. Plaintiffs' attempts to remedy the deficiencies of their first amended complaint fails to meet the PSLRA's pleading requirement, even as interpreted by Makor Rights & Issues, Ltd.

In an attempt to remedy the *scienter* deficiencies in the first amended complaint, plaintiffs' second amended complaint includes statements by an additional confidential witness, CW-5, and includes more details of the witnesses' relationships to Garcia, discussions with Hamburg, and knowledge of the specific sales Garcia fraudulently booked. The

additional witness and additional details are insufficient to adequately plead a strong inference of *scienter*.

Plaintiffs' second amended complaint fails for two primary reasons: (1) the confidential witnesses lack reliability because it is unclear how they learned of the information imparted to this court; and (2) neither the confidential witnesses nor the circumstances of the alleged actions establish that Garcia's misconduct impacted SPSS' financials such that defendants' misstated reports of the financials were directly related to Garcia's actions. We will discuss each in turn.

We already determined that vague statements of confidence are insufficient to establish a witness' reliability. Therefore, statements such as "CW-3 confirms ... that Defendants Noonan and Hamburg were intimately aware of how deferred revenue was improperly booked, including the booking of revenue based on the letter of intent to make a purchase, and condoned this practice" (cplt., ¶ 20), are insufficient. See Polansky v. Anderson, 2005 WL 3557858, *7 (N.D.Ill.2005) ("mere conclusory language which asserts fraud, without a description of fraudulent conduct, does not satisfy Rule 9(b)"); Premier Capital Management, L.L.C. v. Cohen, 2003 WL 21960357, *5 (N.D.Ill.2003) ("Conclusory allegations that defendants acted with knowledge that the representations were false and misleading do not satisfy the PSLRA's pleading requirements"); Rehm v. Eagle Finance Corp., 954 F.Supp.1246, 1255 (N.D.Ill.1997) ("plaintiff must do more than speculate as to defendants' motives or make conclusory allegations of scienter; plaintiff must allege specific facts"). And vague assertions by one confidential witness corroborated by vague assertions by another are still insufficient to establish *scienter*. In re American Business Financial Services, Inc. Sec. Litigation, 2005 WL 1324880, *11 (E.D. Pa.2005).

Additionally, any information witnesses received second- or third-hand is insufficient to establish its reliability. *See* In re Vertex Pharmaceuticals Inc., Sec. Litigation, 357 F.Supp.2d 343, 353 (D.Mass.2005) (confidential witnesses could not establish defendants' *scienter* because, for one reason, they did not have personal knowledge of the most important facts they allege); City of Austin Police Retirement System, 388 F.Supp.2d at 943. Therefore, we cannot rely on allegations like those in paragraph 26: "... CW-5 remained in contact with his/her former co-workers at SPSS after leaving the Company in August 2002. Through these contacts, CW-5 confirmed that Garcia continued to artificially inflate revenues by using the same accounting manipulations she did while CW-5 was at the Company" (cplt ¶26; *see also* cplt., ¶¶ 15, 23). Finally, we must note that vague assertions such as "CW-3 estimates that Garcia was inflating revenues on the order of millions of dollars a year" (*id.*, ¶ 21), and Garcia's fraudulently-booked sales "totaled several million dollars" (*id.*, ¶ 25), are not specific enough to connect Garcia's fraud to SPSS' financial overstatement of $5.709 million for three years. In fact, in 2002, SPSS only overstated its financials by $818,000 (*id.*, ¶ 13), which is significantly less than the "million dollars" the confidential witnesses state Garcia was fraudulently booking annually.

We are equally as unpersuaded as to the impact of Garcia's conduct on SPSS' financials. Even if we were to find that the plaintiffs adequately pled that defendants knew about Garcia's practices, that is not a direct link to finding that defendants engaged in fraud in reporting SPSS' financials. First, we are still unclear as to the dates and amounts of prematurely- reported income from Garcia's allegedly fraudulent scheme. Along with the indefinite assertions such as "CW-1 is confident that this $5.709 million of improperly recognized revenue that was written off in the Company's restatement is directly attributable

to Garcia's accounting manipulations" (*id.*, ¶13), plaintiffs' confidential witnesses point to a $1.5 million sale and a $280,000-$500,000 sale, both to HCFA, which they allege was prematurely recorded (*id.*, ¶¶ 21, 23). These allegations, however, are unreliable. First, we cannot rely on the allegations of the $1.5 million sale because witness no. 3 does not state the date of the sale, or even the year, nor does he/she, former vice- president of strategic planning, explain how he/she knew about the sale. *See* In re Northpoint Comm. Group, Inc. Sec. Litigation, 184 F.Supp.2d 991, 1000 (N.D.Cal.2001) (finding allegations made by confidential witnesses insufficient to establish *scienter* where the allegations were vague, inconclusive, occasionally contradictory, and did not indicate how the witness knew the information he/she was imparting). Confidential witness no. 2, who reported about the second sale, does state that it was booked around December 2000, but he/she, a federal account manager, does not explain how he/she knew that information. In fact, from the allegation it is possible that he/she learned about the sale from another sales representative who took a complaint from HCFA in the wake of the prematurely-recorded sale (cplt., ¶ 23).[4] Other than those two alleged sales, the complaint does not quantify any specific transactions for us to establish that Garcia's misconduct translated into the $5.709 million overstatement.

Second, plaintiffs assert throughout the brief that Garcia's sales allowed SPSS to meet its revenue targets and thus the sales were material to SPSS' financials. That logic fails for several reasons. Plaintiffs must allege factual support for their claim of materiality, and without more concrete statements by the witnesses, or other sources of information, plaintiffs have failed to do that. Additionally, simply because a sale would push SPSS over its sales goal

---

[4] It also appears that Garcia subsequently "moved back" the December 2000 sale to the beginning of the First Quarter of 2001 (*see* defs' motion, ex. D, at 0068). We assume that means that the sale was actually booked in the quarter it was ultimately reported, and therefore no longer premature or fraudulent. This understanding further discredits plaintiffs' confidential witness statements.

does not necessarily make it material. Here, because we are looking at statements of overall revenue, a sale of minimal value would not be material. Finally, as defendants suggest, none of plaintiffs' witnesses was intimately involved in the accounting process out of Chicago, from which the defendants received the SPSS financial data. The fact that CW-1, a sales manager, is "confident that this $5.709 million of improperly recognized revenue that was written off in the Company's restatement is directly attributable to Garcia's accounting manipulations" holds little weight where the description of CW-1 does not indicate that he/she could have knowledge of or access to the facts underlying that assertion. Makor Rights & Issues, Ltd., 2006 WL 172142 at *5. Therefore, we cannot find that the witnesses could have known whether or how Garcia's conduct was integrated into the company's world-wide financials.

Finally, plaintiffs' second amended complaint re-asserts allegations relating to defendants' motives (cplt., ¶¶ 16, 17) and asserts GAAP violations (*id.*, at ¶¶ 18-32, 103-120) to attempt to adequately plead *scienter*. Other than the additional GAAP details we have already discussed, and determined were insufficient to plead accounting violations, plaintiffs did not add much to the second amended complaint. Therefore, our response to the first amended complaint applies with equal validity here. Because plaintiffs have not adequately pled a strong inference of *scienter*, we find that plaintiffs' complaint fails to meet the strict requirements of the PSLRA.

## Section 20(a) Claim

Plaintiffs also allege a violation of section 20(a) of the Securities and Exchange Act. As we held in our response to plaintiff's first amended complaint, "To state a section 20(a) claim against Noonan and Hamburg, plaintiff must allege a primary security violation, each defendants' exercise of general control over SPSS, and each defendants' 'power or ability to

control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised.'" Davis I, 3785 F.Supp.2d at 717 (citing Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 881 (7th Cir.1992); Zurich Capital Market Inc. v. Coglianese, 332 F.Supp.2d 1087 (N.D.Ill.2004)). As plaintiffs have once again failed to plead a primary security violation, they cannot proceed with a § 20(a) claim.

Leave to Amend

Defendants ask this court to dismiss plaintiffs' claims with prejudice, denying plaintiffs leave to amend again. We do so.

The heightened pleading requirements of the PSLRA are not the usual stuff of federal pleading motions, which generally relate to the exceedingly relaxed pleading requirements of Rule 12(b)(6). Where to draw the line in light of PSLRA is a relatively new experience. We have no doubt that this dismissal will be appealed, and it may well be that the Court of Appeals will conclude that we raised the threshold too high. If it so concludes, then the action may proceed upon the present pleadings. If it agrees with this court that the PSLRA standard acts as a bar, we see no prejudice to plaintiffs in not permitting them to amend once again. As this and the earlier opinion in this case illustrate, the issues are very fact-, or more accurately, "allegation"-intensive. We are confident that plaintiffs have given it their best shot in the second amended complaint, and we see no reason to repeat an analysis of yet another complaint.

Plaintiffs began with claims based on the aborted relationship with AOL and Garcia revenue recognition, as well as claims against KPMG LLP. The present pleadings rest almost entirely upon the Garcia claims, that she recognized revenue prematurely, and that resulted in material misstatements in the financials. We have considerable difficulty in making that

connection. Premature booking of revenues will inflate the current statement – but deflate the next. The allegations do not suggest that the sales were not subsequently concluded – or at least they do not specify that they were not, or when, or what amounts. In those circumstances we do not think the PSLRA permits us to make the leap in logic that plaintiffs must necessarily establish: that Garcia's misconduct required the subsequent substantial restatements of the financials.

Plaintiffs' second amended complaint differs very little from plaintiff's first amended complaint. With the exception of adding a plaintiff to remedy their previous standing problem, plaintiffs have not cured any of the deficiencies we identified in our thorough response to plaintiff's first amended complaint. Although plaintiffs added confidential witness 5 to testify to Garcia's misconduct, and added some details to other witnesses' testimony, the second amended complaint suffered from the same failures as the first, specifically, inability to connect Garcia's conduct to defendants' actions. And although plaintiffs somewhat shifted their legal theory from a focus on statements surrounding the AOL agreement to a focus on statements based specifically on restated financials, they relied on the same factual allegations to make both attempts. We find that plaintiffs have had ample opportunity to correct these deficiencies and have been unable to do so. Therefore, we dismiss the complaint with prejudice.

## CONCLUSION

For the foregoing reasons, we grant defendants' motion to dismiss plaintiffs' complaint with prejudice.

JAMES B. MORAN
Senior Judge, U. S. District Court

March 14, 2006.